# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ABINGDON DIVISION

| | |
|---|---|
| **GARY PATRICK ADKINS,** ) | |
|     Plaintiff ) | |
| v. ) | Civil Action No. 1:18cv00041 |
| ) | **REPORT AND** |
| **ANDREW SAUL,**[1] ) | **RECOMMENDATION** |
| **Commissioner of Social Security,** ) | |
|     Defendant ) | By:   PAMELA MEADE SARGENT |
| ) |         United States Magistrate Judge |

*I. Background and Standard of Review*

Plaintiff, Gary Patrick Adkins, ("Adkins"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claim for disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 *et seq.* (West 2011 & Supp. 2019). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g). Neither party has requested oral argument. This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may

---

[1] Andrew Saul became the Commissioner of Social Security on June 17, 2019; therefore, he is substituted for Nancy A. Berryhill as the defendant in this case.

be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Adkins protectively filed his application for DIB on August 21, 2015, alleging disability as of January 1, 2014, based on degeneration of the intervertebral disc; cervical disc disorder; low back pain; fatigue; aortic valve disorder; hypertension; hyperlipidemia; diabetes mellitus; and osteoarthritis. (Record, ("R."), at 111, 316-17, 328.) The claim was denied initially and upon reconsideration. (R. at 246-48, 254-57.) Adkins then requested a hearing before an administrative law judge, ("ALJ"). (R. at 258-59.) The ALJ held a hearing on October 10, 2017, at which Adkins was represented by counsel. (R. at 125-44.)

By decision dated December 4, 2017, the ALJ denied Adkins's claim. (R. at 111-19.) The ALJ found that Adkins met the nondisability insured status requirements of the Act for DIB purposes through June 30, 2016. (R. at 113.) The ALJ found that Adkins had not engaged in substantial gainful activity since January 1, 2014, the alleged onset date.[2] (R. at 113.) The ALJ found that, through the date last insured, Adkins had severe impairments, namely lumbar and cervical degenerative disc disease, but he found that Adkins did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 113-14.) The ALJ found that, through the date last insured, Adkins had the residual functional

---

[2] Therefore, Adkins must show that he was disabled between January 1, 2014, the alleged onset date, and June 30, 2016, the date last insured, in order to be eligible for benefits.

capacity to perform light work[3] that required no more than occasional climbing, balancing, stooping, kneeling and crawling; that did not require crouching; and that required no more than occasional exposure to unprotected heights and vibration. (R. at 114.) The ALJ found that Adkins was unable to perform his past relevant work. (R. at 118.) Based on Adkins's age, education, work history and residual functional capacity, and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Adkins could perform, including jobs as a cashier, a cafeteria attendant and a sales attendant. (R. at 118-19.) Thus, the ALJ concluded that Adkins was not under a disability as defined by the Act and was not eligible for DIB benefits. (R. at 119.) *See* 20 C.F.R. § 404.1520(g) (2019).

After the ALJ issued his decision, Adkins pursued his administrative appeals, (R. at 312), but the Appeals Council denied his request for review. (R. at 1-6.) Adkins then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. § 404.981 (2019). This case is before this court on Adkins's motion for summary judgment filed March 28, 2019, and the Commissioner's motion for summary judgment filed April 29, 2019.

## II. Facts

Adkins was born in 1962, (R. at 316), which, at the time of the date last insured, classified him as a "person closely approaching advanced age" under 20 C.F.R. § 404.1563(d). Adkins has a high school education and vocational training

---

[3] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. § 404.1567(b) (2019).

as an auto body repairman. (R. at 329.) He has past work experience as an owner and operator of an automobile body repair shop. (R. at 129-31, 329.)

Cecilia Thomas, a vocational expert, also was present and testified at Adkins's hearing. (R. at 139-42.) Thomas classified Adkins's past work as an auto body technician as medium[4] and skilled. (R. at 139-40.) However, she stated that Adkins's work, as he performed it, was classified as heavy.[5] (R. at 140.) Thomas stated that Adkins had no transferable skills to the light or sedentary[6] level. (R. at 140.) Thomas was asked to consider a hypothetical individual of Adkins's age, education and work history, who could perform light work that did not require more than occasional climbing, balancing, stooping, kneeling and crawling; that did not require crouching; and that did not require more than occasional exposure to unprotected heights and vibration. (R. at 140-41.) Thomas testified that such an individual could not perform Adkins's past work, but could perform other work existing in significant numbers in the national economy, including jobs as a cashier, a cafeteria attendant and a sales attendant. (R. at 141.) Thomas next was asked to consider the same individual, but who would be limited to sedentary work. (R. at 141-42.) She stated that the individual would be found disabled under

---

[4] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. § 404.1567(c) (2019).

[5] Heavy work is defined as work that involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. If an individual can do heavy work, he also can do sedentary, light and medium work. *See* 20 C.F.R. § 404.1567(d) (2019).

[6] Sedentary work involves lifting items weighing up to 10 pounds with occasional lifting or carrying of articles like docket files, ledgers and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. *See* 20 C.F.R. § 404.1567(a) (2019).

the Medical-Vocational Guidelines, ("the Grids"), found at 20 C.F.R. Part 404, Subpart P, Appendix 2. (R. at 142.)

In rendering his decision, the ALJ reviewed records from Dr. R. S. Kadian, M.D., a state agency physician; Dr. Wyatt S. Beazley, III, M.D., a state agency physician; Wake Forest Baptist Medical Center, ("Wake Forest"); Bluefield Clinic Company; Bluefield Regional Hospital; Bluefield Regional Medical Center; Rheumatology and Pulmonary Clinic, P.L.L.C.; Raleigh Neurosurgical Clinic, Inc.; St. Mary's Neurosurgery, LLC; The Clinic; and Kimberly Stout, a physical therapist. Adkins's counsel also submitted additional medical reports from Wake Forest to the Appeals Council.[7]

The record shows that Adkins has a history of cervical degenerative disc disease prior to his alleged onset date. (R. at 378-81.) On May 16, 2008, x-rays of Adkins's cervical spine showed degenerative changes at the C5, C6, and C7 disc space with encroachment of the neural foramina bilaterally. (R. at 378-79.) On September 10, 2009, an MRI of Adkins's cervical spine showed disc dehydration and facet arthrosis from C4-T1; a herniated nucleus pulposus, ("HNP"), at the C4-C5 level on the right side with impingement of the exiting spinal nerve; an HNP at the C5-C6 level on the left side with impingement of the exiting spinal nerves; and an HNP at the C6-C7 level with impingement of the exiting spinal nerves. (R. at 380.)

On October 10, 2012, Adkins was seen at Bluefield Clinic Company by Dr. Gary McCarthy, M.D., for complaints of right knee and low back pain. (R. at 383.)

---

[7] Since the Appeals Council considered and incorporated this additional evidence into the record in reaching its decision, (R. at 1-6), this court also must take these new findings into account when determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dep't of Health & Human Servs.,* 953 F.2d 93, 96 (4th Cir. 1991).

Examination showed crepitus on range of motion and slight swelling of the right knee and positive right straight leg raising tests. (R. at 383.) Dr. McCarthy administered an injection in Adkins's right knee. (R. at 383.) On October 10, 2012, x-rays of Adkins's right knee showed degenerative arthritis. (R. at 383-84.) On October 17 and 24, 2012, Adkins received injections in his knee. (R. at 381-82.) On September 11, 2013, Adkins was seen at Rheumatology and Pulmonary Clinic by Dr. Wassim Saikali, M.D., for complaints of continuing chronic neck pain and bilateral knee pain. (R. at 389-90.) Dr. Saikali diagnosed generalized osteoarthritis and cervical spondylosis. (R. at 389.)

On May 19, 2014, an MRI of Adkins's cervical spine showed multi-level degenerative disc disease and multi-level canal and foraminal stenosis. (R. 666-67.) The most significant level affected was C5-C6 with broad-based disc osteophyte complex, moderate to severe canal stenosis and severe bilateral foraminal stenosis. (R. at 666-67.)

On August 28, 2014, an MRI of Adkins's lumbar spine showed degenerative spondylosis of the lumbar spine; annular tear associated with the L4-L5 level; moderate to severe right neural foraminal encroachment at the L4-L5 level; mild to moderate left foraminal encroachment at the L4-L5 level; and mild foraminal encroachment on the right L5-S1 level. (R. at 481-82.) That same day, an MRI of Adkins's thoracic spine and cervical spine showed multi-level small Schmorl's nodes from T6-T12; multi-level small marginal osteophytes, most prominently from T4 inferiorly; a hemangioma associated with the T6 vertebral body; minimal disc bulge at T5-T6 with minimal distortion of the ventral thecal sac central and slightly left paracentral; disc bulges from the C4-C5 through the C6-C7 levels, most prominent at C5-C6, with C5-C6 distorting the cervical cord at this level; and mild degenerative spondylosis of the thoracic spine. (R. at 484-85.)

On November 3, 2014, x-rays of Adkins's lumbar spine showed very mild anterolisthesis of the L5-S1 level related to facet degenerative disease at the L4-L5 and L5-S1 levels; endplate degenerative disease throughout the lower thoracic spine and thoraco-lumbar junction; sclerosis of the sacroiliac joints bilaterally, likely representing long-standing sacroiliitis, more prominent on the left; and the bones appeared to be osteopenic. (R. at 656.) That same day, x-rays of Adkins's cervical spine showed moderate to moderately severe degenerative changes between the C4-C7 disc spaces; and prominent osteophyte formation along the posterior on longitudinal line at the C5-C6 and C6-T7 disc spaces, likely creating significant canal stenosis. (R. at 657.)

On November 26, 2014, Adkins was seen at Wake Forest for neck pain and radicular pain with numbness and tingling. (R. at 508.) Examination showed normal range of motion of the neck; normal muscle strength and bulk; decreased left upper arm sensation; and normal gait. (R. at 509-10.) There was no tenderness or spasm in the cervical and lumbar spine. (R. at 510.) Adkins was diagnosed with severe cervical spinal stenosis from C4-C7 with overt posterior osteophytes at each level, and his cord was compressed at the C5-C6 disc space. (R. at 511.) An anterior cervical discectomy and fusion, ("ACDF"), at the C4-C7 level was recommended. (R. at 511.) On December 4, 2014, an ACDF was performed. (R. at 410-11.) On January 6, 2015, Adkins reported that he was doing well overall with some neck and left shoulder pain, but with improvement. (R. at 525.) He reported that he no longer experienced numbness, and the weakness had improved. (R. at 525.) Examination showed normal muscle bulk and strength, a normal gait, and his incision was healing well. (R. at 526.)

On March 3, 2015, Adkins continued to report that he was doing well overall. (R. at 534.) He reported neck and left shoulder pain and pain to the deltoid

region, but with improvement. (R. at 534.) Adkins also reported numbness in the left arm to various fingers, with some numbness in the right arm. (R. at 534.) Examination showed normal muscle tone and bulk throughout; he was able to shift weight onto his heels and toes; he was able to stand from a seated position unassisted; straight leg raising tests were negative; he had intact sensation; his gait was stable; and he was able to tandem walk without difficulty. (R. at 536-37.) Dr. Charles L. Branch, Jr., M.D., a physician with Wake Forest, reported that Adkins looked "quite good with great strength in his arms and a well healed incision." (R. at 537.) On March 4, 2015, x-rays of Adkins's cervical spine showed status-post ACDF from C4-C7 with anterior plate and screw fixation with no evidence of hardware failure or loosening; no acute fracture or change in alignment; and interval decrease in prevertebral soft tissue swelling and removal of surgical drain. (R. at 539.)

On August 17, 2015, Adkins was seen at Bluefield Clinic Company for complaints of intermittent neck discomfort with radicular tingling in the left arm and low back pain. (R. at 572-76.) Adkins had full range of motion of the neck; no cyanosis or edema of the extremities; normal station and gait; intact sensation; normal curvature of the thoracolumbar spine; intact muscle strength; positive straight leg raising tests on the left; deep tendon reflexes were 2/4; normal mood and affect; and good insight and judgment. (R. at 574-75.) Adkins was diagnosed with hyperglycemia; Vitamin D deficiency; hypertension; hyperlipidemia; and low back pain. (R. at 576.)

On August 18, 2015, an MRI of Adkins's lumbar spine showed degenerative changes at the L4-L5 level, including moderate hypertrophic facet and ligamentum flavum changes, greater on the right; diffuse disc bulging with a small right parasagittal annular tear, resulting in moderate to marked bilateral neural foraminal

narrowing, greater on the right; and mild hypertrophic facet changes of L5-S1 without significant hypertrophic changes elsewhere. (R. at 488.)

On November 3, 2015, Adkins was seen at Wake Forest for complaints of increased and more continuous low back pain with bilateral buttock pain. (R. at 540.) Examination revealed normal muscle strength and bulk throughout and a normal gait. (R. at 540-41.) X-rays of Adkins's lumbar spine showed mild anterolisthesis of the L5-S1 level and degenerative changes of the lower thoracic and lumbar spine. (R. at 544.) Adkins was diagnosed with bilateral low back pain without sciatica. (R. at 541.) Physical therapy was ordered. (R. at 541.)

On November 6, 2015, Dr. R. S. Kadian, M.D., a state agency physician, completed a medical assessment, finding that Adkins could perform light work. (R. at 230-32.) He found that Adkins could occasionally climb, stoop, kneel, crouch and crawl and frequently balance. (R. at 231.) No manipulative, visual or communicative limitations were noted. (R. at 231.) Dr. Kadian opined that Adkins should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 232.)

On November 9, 2015, Adkins complained of low back pain. (R. at 491.) He stated that he owned his own business and continued to work. (R. at 491.) Adkins participated in physical therapy through December 4, 2015. (R. at 489-507.) On December 1 and 3, 2015, despite reporting decreased back stiffness, Adkins reported increased pain due to an increased workload. (R. at 502-03.)

On December 9, 2015, Adkins was seen at Wake Forest for complaints of ongoing aches and pains that were worse with certain activity and weather. (R. at 554.) He reported that he was "very functional." (R. at 554.) Adkins stated that he

had attempted physical therapy and had tried Mobic with modest benefit. (R. at 554.) Examination revealed a well-healed neck incision, and he had overall good strength. (R. 554.) X-rays of Adkins's cervical spine showed solid fusion with no complicating features, and his lumbar MRI showed no evidence of stenosis. (R. at 554.)

On December 31, 2015, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, finding that Adkins could perform light work. (R. at 241-43.) He found that Adkins could occasionally climb, stoop, kneel, crouch and crawl and frequently balance. (R. at 242.) No manipulative, visual or communicative limitations were noted. (R. at 242.) Dr. Beazley opined that Adkins should avoid concentrated exposure to vibration and hazards, such as machinery and heights. (R. at 243.)

On February 25, 2016, Adkins reported that, although he continued to experience neck pain, it was tolerable. (R. 563-68.) Adkins reported his upper extremity numbness and tingling occurred infrequently. (R. at 563.) Upon examination, Adkins had a normal gait and strength with negative straight leg raising tests; he had lumbar and thoracic paraspinal tenderness, but normal range of motion in all extremities; and he had neck paraspinal tenderness, as well as tenderness in the occiput, and facet loading maneuvers were positive with limited axial range of motion. (R. at 566.) Adkins was diagnosed with chronic pain syndrome; bilateral low back pain without sciatica; muscle spasm; thoracic degenerative disc disease; lumbar degenerative disc disease; and osteoarthritis of the right knee. (R. at 567.)

On March 30, 2016, Adkins complained of low back pain and rated his pain at a level of six out of 10 with medication and nine out of 10 without. (R. at 612.)

Examination showed normal gait and strength; straight leg raising tests were negative; lumbar and thoracic paraspinal tenderness; normal range of motion in all extremities; and Adkins was neurologically intact. (R. at 615.)

On June 22, 2016, Adkins complained of low back pain, which he rated a level of seven out of 10 with medication and nine out of 10 without. (R. at 619.) Examination showed normal gait and strength; straight leg raising tests were negative; lumbar and thoracic paraspinal tenderness; normal range of motion in all extremities; and Adkins was neurologically intact. (R. at 622.) On July 25, 2016, bilateral facet injections at the L3-L4, L4-L5 and L5-S1 levels were administered. (R. at 626-27.)

On September 1, 2016, Adkins complained of joint pain, but denied muscle aches and weakness. (R. at 585.) Adkins reported chronic neck, lower back and bilateral knee pain. (R. at 585.) He stated that his neck pain had greatly improved since his surgery. (R. at 585.) Examination showed normal motor strength and tone, and Adkins walked with a limp. (R. at 585.) On November 3, 2016, Adkins reported that his pain had not changed. (R. at 694.) He complained of neck pain, which radiated into his left shoulder and arm, lumbar pain and bilateral knee and hip pain. (R. at 694.) Examination showed normal gait and strength; negative straight leg raising tests; lumbar and thoracic paraspinal tenderness; and normal range of motion in all extremities. (R. at 697.)

On January 11, 2017, examination of Adkins's neck revealed no muscle spasms and normal range of motion; his musculoskeletal examination showed no spasms, tenderness to palpation and limited range of motion, negative straight leg raising tests and normal muscle strength; and he had a normal mood and affect. (R. at 152.) Adkins reported that his medication regimen contributed to good quality of

life and function, with no side effects. (R. at 150.) Adkins reported that his knee injections significantly reduced his knee pain. (R. at 212.) Adkins was diagnosed with chronic midline low back pain with right-sided sciatica; cervical degenerative disc disease; and bilateral chronic knee pain. (R. at 152-53.) On January 16, 2017, an MRI of Adkins's lumbar spine showed mild degenerative disc disease at the L4-L5 level. (R. at 169.) Throughout 2017, Adkins complained of back pain, but stated that his pain was decreased with medication. (R. at 182, 189, 201.) Examination of Adkins's neck showed positive paraspinal tenderness and tenderness in the occiput, as well as limited range of motion; he had normal gait and strength; negative straight leg raising tests; lumbar and thoracic paraspinal tenderness; normal range of motion in all extremities; normal affect; and he was able to communicate well. (R. at 185, 193, 205.)

On August 10, 2017, Adkins underwent a functional capacity evaluation at Heartland Rehabilitation Services. (R. at 755-58.) Kimberly Stout, a physical therapist, conducted the evaluation and reported that Adkins performed with full effort throughout testing. (R. at 755.) Adkins had restricted range of motion in the cervical and lumbar regions. (R. at 758.) The evaluation established that Adkins was able to work at the sedentary level on a part-time basis due to positional tolerances, decline in movement quality, increase in pain level and limited ability to perform two hours of consecutive activity during testing. (R. at 755, 758.) That same day, Stout completed a medical assessment indicating that Adkins could lift and carry items weighing 10 pounds; stand and/or walk at least two hours in an eight-hour workday; periodically alternate sitting and standing; occasionally climb, balance, kneel and stoop and never crouch or crawl; and frequently reach and constantly handle. (R. at 748-51.)

Adkins was seen at Wake Forest in 2018 for low back pain. (R. at 14-46.) He was diagnosed with lumbar radiculopathy; lumbar facet arthropathy; and spinal stenosis of the lumbar region without neurogenic claudication. (R. at 35.) Examination revealed normal balance and position sense; an antalgic gait; normal sensation, motor strength and reflexes; limited range of motion of the neck; paraspinal tenderness of the cervical spine; positive straight leg raising tests; and crepitus in both knees. (R. at 16-17, 39-40.)

### *III. Analysis*

The Commissioner uses a five-step process in evaluating DIB claims. *See* 20 C.F.R. § 404.1520 (2019). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. § 404.1520. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. § 404.1520(a)(4) (2019).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. § 423(d)(2)(A) (West 2011 & Supp.

2019); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Adkins argues that the ALJ erred by failing to find that his impairment(s) met or equaled the listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, § 1.04. (Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 14-18.) Adkins also argues that substantial evidence does not exist to support the ALJ's finding that he had the residual functional capacity to perform light work. (Plaintiff's Brief at 18.)

Adkins argues that the ALJ erred by failing to find that he met or equaled the listing for disorders of the spine, found at 20 C.F.R. Part 404, Subpart P, § 1.04. (Plaintiff's Brief at 14-18.) Section 1.04 requires that the disorder result in *compromise of the nerve root or the spinal cord* with either (A) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight leg raising test; or (B) spinal arachnoiditis, confirmed by an operative note or pathology report of tissue

-14-

biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or (C) lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in § 1.00(B)(2)(b).

For a claimant to demonstrate that his impairments meet or equal a listed impairment, he must prove that he "meet[s] *all* of the specified medical criteria. An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) (emphasis in original). Here, Adkins's impairment(s) do not meet or equal § 1.04 because the record reveals no evidence of nerve root or spinal cord compromise.

On August 28, 2014, an MRI of Adkins's lumbar spine showed degenerative spondylosis; annular tear associated with the L4-L5 level; moderate to severe right neural foraminal encroachment at the L4-L5 level; mild to moderate left foraminal encroachment at the L4-L5 level; and mild foraminal encroachment on the right L5-S1 level. (R. at 481-82.) That same day, an MRI of Adkins's thoracic spine and cervical spine showed multi-level small Schmorl's nodes from T6-T12; multi-level small marginal osteophytes, most prominently from T4 inferiorly; a hemangioma associated with the T6 vertebral body; minimal disc bulge at T5-T6 with minimal distortion of the ventral thecal sac central and slightly left paracentral; disc bulges from the C4-C7 levels; and mild degenerative spondylosis of the thoracic spine. (R. at 484-85.) On August 18, 2015, an MRI of Adkins's lumbar spine showed degenerative changes at the L4-L5 level; and diffuse disc bulging with a small right parasagittal annular tear, resulting in moderate to marked bilateral neural foraminal narrowing. (R. at 488.) In December 2015, an MRI of Adkins's lumbar

spine showed no evidence of stenosis. (R. at 554.) In January 2017, an MRI of Adkins's lumbar spine showed mild degenerative disc disease at the L4-L5 level. (R. at 169.)

Examinations showed Adkins's motor strength and gait to be normal; he had intact sensation, normal bulk and motor strength and negative straight leg raising tests; and he had full range of motion in all extremities. (R. at 185, 193, 205, 540-41, 554, 566, 574-75, 615, 622.) In December 2015, Adkins reported that he was "very functional," and he had overall good strength. (R. at 554.) In January 2017, Adkins reported that his medication regimen contributed to good quality of life and function. (R. at 150.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986). In September 2016, Adkins reported that his neck pain had greatly improved since his surgery. (R. at 585.) In January 2017, examination of Adkins's neck revealed no muscle spasms and normal range of motion. (R. at 152.) Because there is no objective medical evidence of record showing that Adkins suffers nerve root or spinal cord compromise, he does not meet or equal § 1.04. Thus, substantial evidence supports the ALJ's failure to find that Adkins's impairments meet or equal § 1.04.

Based on my review of the record, I also find that substantial evidence exists to support the ALJ's finding that Adkins had the residual functional capacity to perform light work. In making this determination, the ALJ noted that he was giving "little weight" to Stout's physical assessment because she is not an acceptable medical source pursuant to 20 C.F.R. § 404.1502. (R. at 117.) The ALJ also noted that the assessment was dated more than one year after Adkins's date last insured. (R. at 117.) The ALJ is solely responsible for determining a claimant's residual functional capacity. *See* 20 C.F.R. § 404.1546(c) (2019); *see also* 20 C.F.R. §

404.1527(d)(2) (2019) (a claimant's residual functional capacity is an issue reserved exclusively to the Commissioner); *see Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) ("if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight").

The ALJ gave "great weight" to the opinions of the state agency physicians, who found that Adkins had the residual functional capacity to perform light work. (R. at 117, 230-32, 241-43.) The ALJ noted that these opinions were consistent with the objective evidence of record. (R. at 117.) Under the regulations, the ALJ was entitled to rely on Dr. Kadian's and Dr. Beazley's assessments. *See* 20 C.F.R. § 404.1513a(3)(b)(1) (2019) ("State agency medical or psychological consultants are highly qualified and experts in Social Security disability evaluation."); *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986) (Fourth Circuit cases "clearly contemplate the possibility that [treating physician] opinions may be rejected in particular cases in deference to conflicting opinions of non-treating physicians."); Social Security Ruling, ("S.S.R."), 96-6p, WEST'S SOCIAL SECURITY REPORTING SERVICE, Rulings (West 2013 Supp.) ("In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources.").

The record shows that Adkins reported ongoing work activity into late 2015. (R. at 491, 502-03.) As noted above, examinations showed Adkins's motor strength and gait to be normal; he had intact sensation, normal bulk and motor strength and negative straight leg raising tests; and he had full range of motion in all extremities. (R. at 185, 193, 205, 540-41, 554, 566, 574-75, 615, 622.) In December 2015, Adkins reported that he was "very functional" and he had overall

good strength. (R. at 554.) In January 2017, Adkins reported that his medication regimen contributed to good quality of life and function. (R. at 150.) Based on this, I find that substantial evidence exists to support the ALJ's finding that Adkins had the residual functional capacity to perform light work.

### PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence exists in the record to support the ALJ's finding that Adkins's impairments did not meet or equal § 1.04;

2. Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3. Substantial evidence exists in the record to support the Commissioner's finding that Adkins was not disabled under the Act and was not entitled to DIB benefits.

### RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Adkins's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2018):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time at this time.

DATED: December 3, 2019.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE